IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LESTER PACKER SR., LESTER PACKER II, and SHAWN DYROFF, individually and on behalf of the GLENN O. HAWBAKER, INC. BENEFIT PLAN, | : : : : : : : : : : : : : : : : : : |
| Plaintiffs, | |
| v. | |
| GLENN O. HAWBAKER, INC., the BOARD OF DIRECTORS OF GLENN O. HAWBAKER, INC., the PLAN ADMINISTRATOR OF THE GLENN O. HAWBAKER, INC. BENEFIT PLAN, and JOHN DOES 1-20 | |
| Defendants. | |

Civil Action No.: _____

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Lester Packer Sr., Lester Packer II, and Shawn Dyroff ("Plaintiffs"), by and through their undersigned attorneys, on behalf of the Glenn O. Hawbaker, Inc. Benefit Plan[1] (the "Plan"), themselves and all others similarly situated, bring this class action lawsuit against Defendants Glenn O. Hawbaker, Inc. ("Defendant," "Hawbaker," or "GOH"), the Board of Directors of Glenn O. Hawbaker, Inc. (the "Board"), the Plan Administrator of the Glenn O. Hawbaker, Inc. Benefit Plan (the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

"Plan Administrator") and John Does 1-20. Plaintiffs' allegations are based upon information and belief, except as to the allegations that pertain to Plaintiffs, which are based upon personal knowledge. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against the Plan's fiduciaries, including Defendants Hawbaker, the Board, and the Plan Administrator, for breaches of their fiduciary duties by failing to make required contributions to Hawbaker's 401(k) retirement savings plan, the Plan, and other employee benefits plans that are covered under ERISA, during the proposed Class Period (defined below).

2. During the Class Period, Defendants engaged in a systematic scheme of wage payment and employee benefits abuses that involved, among other things, failing to pay prevailing wages to hourly employees working on prevailing wage projects in Pennsylvania by misrepresenting and misreporting the amounts paid by Defendant Hawbaker for various wage benefits, when Hawbaker was obligated to pay the difference between the actual amounts paid for such benefits and the applicable prevailing wage in cash (*i.e.*, higher hourly wage payments) to each hourly employee working on the prevailing wage projects.

3. Defendants' scheme was disclosed publicly on April 8, 2021, when the Pennsylvania Attorney General filed a criminal complaint against Hawbaker alleging four counts of felony "Theft by failure to make required disposition of funds received,"

2

*Commonwealth v. Glenn O. Hawbaker, Inc.,* No. Cr-89-2021 (Mag. Dist. 49-2-01, Centre County, Pa. filed Apr. 8, 2021). As a result of Defendant's systematic failure to properly pay its hourly employees throughout Pennsylvania, Defendants have violated ERISA.

4.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), and failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

5.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

6.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

7.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the Plan is administered, where at least one of the alleged breaches took place and where Defendants reside.

## PARTIES

### Plaintiffs

8.     Plaintiff Lester Packer Sr. is an individual who resides at 13685 State Route 287, Trout Run, Pennsylvania. Plaintiff Lester Packer Sr. was employed as a Field Tech at Hawbaker during the time period of February 1999 through and including February 2017. At least 97% of the work Plaintiff performed at Hawbaker was on prevailing wage projects, *i.e.*, state or Davis-Bacon Act projects in which Hawbaker was obligated to pay its employees the "prevailing wage" throughout the duration of the project.

9.     Plaintiff Lester Packer II is an individual who resides at 400 Wilson Street, Jersey Shore, Pennsylvania. Plaintiff Lester Packer II was employed as a Laborer/ Operator at Hawbaker during the time period of April 2004 through and including May 2020. At least 97% of the work Plaintiff performed at Hawbaker was on prevailing wage projects, *i.e.*, state or Davis-Bacon Act projects in which Hawbaker was obligated to pay its employees the "prevailing wage" throughout the duration of the project.

10.    Plaintiff Shawn Dyroff is an individual who resides at 370 Zinck Road, Jersey Shore, Pennsylvania. Plaintiff Shawn Dyroff was employed as a Tri Axle Driver, Paver Operator, Shuttle Buggy Operator and Technician at Hawbaker during the time period of April 2002 through and including June 2020. At least 95% of the work Plaintiff performed at Hawbaker was on prevailing wage projects, *i.e.*, state or

Davis-Bacon Act projects in which Hawbaker was obligated to pay its employees the "prevailing wage" throughout the duration of the project.

### The Company Defendant

11.     Defendant, Glenn O. Hawbaker, Inc., is a Pennsylvania corporation located at 1952 Waddle Road, Suite 203, State College, Centre County, Pennsylvania.

12.     At any given time, Hawbaker employs approximately 1,200 employees, including roughly 100 employees who work at the company's corporate headquarters, and approximately 600 to 900 employees who work at various construction sites throughout Pennsylvania and surrounding states on both public and private projects. A very large percentage of Hawbaker's construction projects are government-funded public works projects requiring compliance with state and/or federal prevailing wage laws. PennDOT is Hawbaker's largest government client.

13.     Hawbaker is the Plan sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Hawbaker is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) it appointed Plan fiduciaries to serve as the Plan Administrator and was responsible for monitoring those fiduciaries.

14.     At all times relevant to this action, Hawbaker has been responsible for the administrative and investment responsibilities associated with the Plan and has

been the "named fiduciary" and "plan administrator," as such terms are defined under ERISA.

### The Board Defendants

15.     Each member of the Board during the Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

16.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

17.     On information and belief, the Board has discretion to authorize Hawbaker to contribute amounts to Plan participants.

### The Plan Administrator Defendant

18.     On information and belief, Defendant Hawbaker has delegated certain administrative and investment related duties to Defendant Plan Administrator. Defendant Plan Administrator was a fiduciary of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets.

### Additional John Doe Defendants

19.     To the extent that there are additional officers and employees of Hawbaker who are/were fiduciaries of the Plan during the Class Period, the identities

6

of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them in the instant action. Thus, without limitation, unknown "John Doe" Defendants 11-20 include, but are not limited to, Hawbaker officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

<u>**THE GLENN O. HAWBAKER, INC. BENEFIT PLAN**</u>

20.     The Glenn O. Hawbaker, Inc. Benefit Plan is a single-employer "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

21.     Hawbaker, at all relevant times, has served as the Plan Sponsor and the Plan Administrator.

22.     Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company, at all relevant times, has served as the Trustee of the Plan.

23.     According to the Plan's Annual Report on Form 5500, as of December 31, 2019, the Plan had 1,490 participants with account balances and more than $151 million in assets that have been entrusted to the care of the Plan's fiduciaries.

7

## ERISA'S FIDUCIARY STANDARDS

24.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which **$5.6 trillion was held in 401(k) plans**. *See* INVESTMENT COMPANY INSTITUTE, Retirement Assets Total $28.7 Trillion in First Quarter 2020 (June 17, 2020).

25.     In a defined contribution plan, like the Plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

26.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

27.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

28.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

29.     Under 29 U.S.C. §1104(a)(D), a fiduciary must discharge his duties in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

30.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Specifically, 29 U.S.C. §1105(a) provides a private cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to

cure any breach of duty. Specifically, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled

"Liability for breach by co-fiduciary") provides:

> In addition to any liability which he may have under any other
> provisions of this part, **a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary** with respect
> to the same plan in the following circumstances:
>
> (1)    **if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary**, knowing such act or
> omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in
> the administration of his specific responsibilities which give rise to his
> status as a fiduciary, **he has enabled such other fiduciary to commit a
> breach**; or
>
> (3)    **if he has knowledge of a breach by such other fiduciary**, unless he
> makes reasonable efforts under the circumstances to remedy the breach.

(Emphasis added).

31.    Likewise, 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a

civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in

relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any
> of the responsibilities, obligations, or duties imposed upon fiduciaries by
> this subchapter shall be personally liable to make good to such plan any
> losses to the plan resulting from each such breach, and to restore to such
> plan any profits of such fiduciary which have been made through use of
> assets of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary.

32.    As set forth in detail below, Defendants breached fiduciary duties to the

Plan and its participants and beneficiaries, and are liable for their breaches and the

breaches of their co- fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

10

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO MAKE REQUIRED CONTRIBUTIONS TO PARTICIPANT ACCOUNTS

33.   During the proposed Class Period (September 1, 2012 to the present) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, Plaintiffs, and the proposed Class by failing to abide by the terms of the Plan in making contributions to participant accounts.

34.   Specifically, the Plan document provides that "Employer Contributions **shall be made** without regard to Net Profits." Art. III, Section 3.01—Employer Contributions (emphasis added).

35.   Art. III, Section 3.01 of the Plan document further provides: "Such Contributions shall be equal to the Employer Contributions," including those described below:

(a)   The amount of each Elective Deferral Contribution for a Participant shall be equal to a portion of Compensation[2] as specified in an Elective Deferral Agreement….

(b)   The Employer shall make Matching Contributions in an amount equal to 50% of Elective Deferral Contributions….

*        *        *        *        *

Such Contributions that are made for or allocated to each person who was an Active Participant at any time during the Plan Year shall be allocated when made in a manner that approximates the allocation that would otherwise have been made as of the last day of the Plan Year. Succeeding allocations shall take into account amounts previously allocated for the Plan Year.

---

[2] The Plan document defines "Compensation" *inter alia* as "the total earnings, except as modified in this definition, from the Employer during any specified period. Art. I, Section 1.02—Definitions.

36.    Pursuant to Section 3.06 of the Plan document, both employee contributions and employer contributions must be allocated to the participant account for whom such contributions are made, stating:

> Elective Deferral Contributions **shall be allocated to the Participants for whom such Contributions are made** under the EMPLOYER CONTRIBUTIONS SECTION of this article. Such Contributions shall be allocated when made and credited to the Participant's Account.

> Matching Contributions **shall be allocated to the persons for whom such Contributions are made** under the EMPLOYER CONTRIBUTIONS SECTION of this article. Matching Contributions shall be allocated no later than the last day of the Plan Year.

Plan Document, Art. III, Section 3.06 (emphasis added).

37.    Pertinent to the instant claims, "back pay" is considered "Compensation" under the terms of the Plan: "Back pay … **shall be treated as Compensation for the Plan Year to which the back pay relates** to the extent the back pay represents wages and compensation that would otherwise be included in this definition." Art. I, Section 1.02—Definitions (emphasis added).

38.    The ERISA's Regulations promulgated by the Employee Benefits Administration of the U.S. Department of Labor ("DOL") reinforce the compulsory nature of promptly allocating employee and employer contributions to participant accounts in defined contribution plans (like the Plan).

39.    For instance, 29 CFR § 2510.3-102(a)(1) defines "plan assets" as "amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, **as of the earliest date**

**on which such contributions or repayments can reasonably be segregated from the
employer's general assets**." (Emphasis added).

40.     The Regulations provide real world examples of the immediacy with
which employee elective contributions and employer matching contributions become
plan assets, stating:

> Employer B is a large national corporation which sponsors a 401(k) plan
> with 600 participants. B has several payroll centers and uses an outside
> payroll processing service to pay employee wages and process
> deductions. Each payroll center has a different pay period. Each center
> maintains separate accounts on its books for purposes of accounting for
> that center's payroll deductions and provides the outside payroll
> processor the data necessary to prepare employee paychecks and process
> deductions. The payroll processing service issues the employees'
> paychecks and deducts all payroll taxes and elective employee
> deductions. The payroll processing service forwards the employee
> payroll deduction data to B on the date of issuance of paychecks. B
> checks this data for accuracy and transmits this data along with the
> employee 401(k) deferral funds to the plan's investment firm within 3
> business days. The plan's investment firm deposits the employee 401(k)
> deferral funds into the plan on the day received from B. **The assets of
> B's 401(k) plan would include the participant contributions no later than
> 3 business days after the issuance of paychecks**.

CFR § 2510.3-102(f)(2) (emphasis added).

41.     Defendants' failures to comply with the terms of the Plan and applicable
DOL regulations by failing to make required contributions to Plaintiffs' and the Class'
individual 401(k) accounts within the strict time limitations for making such
contributions and in required the amounts (as described in detail below), to the
detriment of participants and beneficiaries, constitutes a breach of the fiduciary
duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions (and

omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

42.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a Class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. §1109(a) to compensate Plaintiffs and the Class for the financial consequences of Defendants' carelessness and mismanagement of Plan assets, and to pay amounts owed to participants under the Plan documents. In addition, Plaintiffs seek such other equitable or remedial relief for Plaintiffs and the Class as the Court may deem appropriate.

## BACKGROUND REGARDING PREVAILING WAGE LAWS

43.     Public works projects funded by $25,000 or more of state funds are subject to the Pennsylvania Prevailing Wage Act ("PWA"). Public works projects funded by $2,000 or more of federal funds are subject to the Davis-Bacon Act ("DBA"). The PWA and the DBA are intended to ensure that wages paid to workers on publicly-funded construction projects comport with the wages that prevail in that particular geographical region. The laws ensure a level playing field be requiring that every bidder on a publicly-funded project pay the same wage rates to its workers, as required by a prevailing wage determination. Prevailing wage determinations are issued by the DOL or the Pennsylvania Department of Labor& Industry depending on whether the project is subject to federal or state prevailing wage requirements.

Contractors bidding on public works projects are notified in the Request for Proposal that the project is subject to prevailing wage law requirements.

44.     When a contractor is awarded a public works projects subject to the PWA or the DBA, the contractor agrees that it will pay its workers in accordance with prevailing wage laws. To meet this agreement and get paid for the project, the contractor must submit sworn certified payroll reports to contracting government agencies attesting that the contractor paid its workers on the project in accordance with prevailing wage laws. Thus, contractors on public works projects are required to use a portion of the moneys received on the contract to pay their workers the applicable prevailing wage.

45.     Wage determinations specify the different wages a contractor must pay each classification of worker, such as heavy equipment operators, carpenters, laborers, etc., on a given project. Generally, classifications that entail a higher degree of expertise or training have higher wage determination rates. All workers must be paid the applicable wage determination rate for all wages and benefits earned in each classification each week. Each wage determination consists of both an hourly base rate and an amount allowable as a fringe benefit credit. The hourly base rate is the amount that is paid in wages directly to the workers.

46.     The fringe benefit component is intended to offset the employers' total wage obligation by crediting them for the costs incurred in providing benefits to prevailing wage workers in lieu of cash wages. Contractors have three options for paying the fringe benefit component. They may pay the fringe benefit component to

15

the worker entirely in cash wages. They may contribute the full amount of the component into bona fide fringe benefit programs, such as health insurance, retirement plans, or paid time off. Or, they may use some combination of cash and contributions to bona fide benefits. However, the entire fringe benefit component must be used for the sole benefit of the worker who earned the money on the publicly-funded project.

47.     There are limitations to the costs a contractor may assess to prevailing wage fringe benefit funds. For instance, contractors may not use prevailing wage fringe benefit funds to cover internal administrative fees, and the amount of fringe benefit money contributed into a bona fide fringe benefit program must be reasonably anticipated to cover the actual cost of the benefit. Prevailing wage fringe benefit money cannot be used to fund benefits for anyone other than the individual worker who earned the money.

48.     Both the PWA and the DBA require employers to annualize fringe benefit credits taken for contributions to employee benefits, to ensure that the employers are only offsetting their prevailing wage obligations by the proportion of contributions actually attributable to time the employees spend on public works projects. Thus, an employer may only claim a fringe benefit credit for the actual hourly rate of contributions for all hours worked in a year by each worker on both prevailing wage and non-prevailing wage work. So, if an employee worked 1,500 hours on prevailing wage jobs and 500 hours on jobs not covered by the PWA or the DBA during the year, an employer's contribution of $2,000 to a particular employee's

pension fund would only be creditable for $1,500, or $1.00 per hour, as a fringe benefit under the prevailing wage laws.

49.     Every week, contractors working on public works projects must submit certified payrolls, which are sworn certifications attesting that wages and fringe benefits were paid in accordance with prevailing wage laws, to the contracting government entity for every public works project as part of their application for payment.

## DEFENDANT'S REPRESENTATIONS TO HOURLY EMPLOYEES

50.     Defendant's Employee Manual contained multiple representations and promises about employee benefits:

> **1.2    Benefits:** Our comprehensive benefits package for regular full-time employees includes: basic group life and accident death and dismemberment insurance for each employee, their spouse and their unmarried children; additional group life insurance of 15% of previous year's earnings up to $100,000; short-term disability insurance for all employees; long-term disability insurance for exempt employees; year-round health and vision insurance; prescription drug benefits, and voluntary dental insurance; profit sharing plan and 401K traditional and 401K Roth plans with employer match; employee assistance program (EA), education assistance program and paid time off package, including holiday pay and bereavement pay.

51.     More particularly, for publicly-funded projects, Defendant represented and promised that each employee would be paid in cash for any difference between the cost attributable for associated fringe benefits and the requirements of the prevailing wage laws, including PWA and DBA:

> For employees working on public sector construction jobs funded using Federal dollars, GOH [Defendant] complies with Davis-Bacon Act requirements by providing each employee working on public sector contracts health care and retirement benefits, comparable to, or

17

exceeding, the requirements of Davis-Bacon. If the fringe requirement for a given year under the Davis-Bacon regulations is more than the value of the Company's benefits, the difference is paid in cash to the employee. In other words, the employee never receives a fringe lower than the law requires.

52.    In Section **1.12** of the Employee Manual, Defendant represented that the health and welfare and pension fringes it provided "through our group benefit and profit sharing plans" were compliant with Prevailing Wage Law and thus equivalent to the cash difference between the hourly wages paid and the applicable hourly prevailing wage: "Also, on prevailing wage projects, employees will not receive health and welfare and pension fringes in cash, since our company provides this through our group benefit and profit sharing plans."

53.    The Employee Manual further represented, in Section **1.0.1**, that to the extent the company's policies conflicted with any contract entered into by the company, the terms of the contract would prevail: "To the extent these policies conflict with any contract entered into by GOH, the terms of the contract prevail."

54.    In this respect, the PWA specifies that every contract for public work must contain a provision that the workers will be paid the minimum prevailing wages on the project. 43 P.S. § 165. The DBA contains similar provisions. Of necessity, GOH's representations, written policies, promises and agreements with its employees incorporate by reference all of the agency promises to pay the prevailing wage to prevailing wage workers and the workers are, at a minimum, the intended third-party beneficiaries of the promises in the public agency contracts, as set forth in the Employee Manual and elsewhere.

## DEFENDANT'S SCHEME TO UNDERPAY WORKERS

55.   Hawbaker reported how it claimed to be paying its prevailing wage workers by creating and submitting false and misleading fringe benefit letters to each contracting government agency for each project. Those letters listed each job classification for a particular project and a representation as to how workers in each classification would be paid. Such letter would list a "Base Rate," which is the hourly rate workers would receive in the paychecks. For the fringe benefit component, such letters included the following columns: "Health & Welfare," "Cash Pd In addition to Health," "Pension," and "Total Fringes." The fringe benefit letters submitted by GOH during the Class Period (defined below) all listed the amount of cash pad in addition to health as zero (0). The letters listed the same health and welfare cost for all job classifications on the project. The letters listed the amount for pension that varied by job classification.

56.   Hawbaker payroll and accounting employees have explained how GOH calculated the amounts listed on the fringe benefit letters and how those amounts differed from what was recorded the company's payroll and accounting system. Wage determinations list the total hourly cash equivalent of fringe benefits due to workers in each job classification. In its payroll and accounting system, GOH attributed 50% of the total fringe amount to health and welfare and 50% to pension. In the fringe benefit letter, GOH reported that it was allocating 50% of the fringe amount listed in the wage determination to pension.

57.    The health and welfare amount reported in the fringe benefit letters, however, bore no relation to the fringe benefit amount listed on the wage determination. Instead, GOH concocted a grossly exaggerated health and welfare hourly credit by including inflated health insurance costs and nonqualifying expenses in its health and welfare credit calculation. The figure GOH reported in the fringe benefit letter under "Total Fringes" was the sum of the inflated hourly health and welfare rate and the hourly pension rate. The pension amount listed on the fringe benefit letter per employee per hour was put into one big pot and then used to fund all employees', executives', and owners' pension accounts.

58.    What GOH reported on the fringe benefit letters never reflected how GOH was actually using the prevailing wage workers' money. While GOH boasted that it provided great employee benefits and used that supposed "fact as a recruiting tool, in actuality, GOH was stealing its prevailing wage workers' pension and health and welfare money. GOH used its prevailing wage workers' fringe benefit funds to lower its costs, thereby helping GOH to win more government bids, and increasing the company's reported profits.

59.    Forensic accountants retained by the Pennsylvania Office of the Attorney General ("OAG") reviewed GOH's fringe benefit contributions and found that between 2015 and 2018, GOH stole just under $20.7 million of prevailing wage workers' fringe benefit money:

| YEAR | PENSION UNDERFUNDING | H&W UNDERFUNDING | TOTAL | NET COMBINED UNDERFUNDING |
|------|----------------------|-------------------|--------|----------------------------|
| 2015 | $3,454,303 | $426,430 | $3,880,733 | $3,875,246 |
| 2016 | $3,858,623 | $2,063,459 | $5,922,082 | $5,916,948 |
| 2017 | $3,848,721 | $1,583,202 | $5,431,923 | $5,406,300 |
| 2018 | $4,330,141 | $1,233,866 | $5,564,007 | $5,497,959 |
| **Total** | **$15,491,788** | **$5,306,957** | **$21,651,605** | **$20,696,453** |

60.   Both the PWA and the DBA allow employers to use prevailing wage fringe benefit money to fund retirement contributions. As with all prevailing wage fringe money, the contributions must go into the individual participant's retirement account who earned the money. However, GOH used its prevailing wage workers' contributions to fund all GOH profit sharing and 401(k) contributions for all employees, including hundreds of non-prevailing wage employees.

61.   Hawbaker's retirement benefit program has two components: a profit-sharing component and an elective contribution 401(k) component. GOH represented to its employees that the profit-sharing program was designed to reward eligible employees and that contributions were funded by the company. While GOH claimed it was funding the profit-sharing plan, it was actually using fringe benefit moneys from the prevailing wage workers' wages to foot the bill. Moreover, not all employees were eligible to receive profit sharing contributions – to receive them, an employee must have worked a minimum number of hours and be employed on the last day of the calendar year.

62.   Prior to 2019, GOH's profit sharing and 401(k) plan did not provide for immediate vesting. As explained above, GOH was required to annualize prevailing wage pension contributions because its plan did not provide for immediate

21

participation and essentially immediate vesting until 2019. However, GOH failed to do so.

63.    On the fringe benefit letters submitted to contracting government agencies, GOH claimed it was contributing as much as $15.12 per hour into prevailing wage workers' pension accounts, which, according to law, must be made to workers' accounts no less frequently than quarterly. In its payroll and accounting system, GOH allocated half of the total fringe amount listed on the wage determination toward the profit sharing and 401(k) plan. However, instead of paying that money over to the retirement account owned by the worker who earned the money (including Plaintiffs herein), GOH transferred that money into one big, unallocated account. The money sat in that unallocated account throughout the year. Just prior to the end of the first quarter of the following year, that pot of prevailing wage workers' money was spread out across all GOH employees', executives', and owners' retirement accounts.

64.    The forensic accountant retained by the OAG calculated the profit sharing and 401(k) underfunding for GOH prevailing wage workers by year as follows:

| YEAR | AGGREGATE 401(k) UNDERFUNDING |
|---|---|
| 2015 | $3,454,303 |
| 2016 | $3,858,623 |
| 2017 | $3,848,721 |
| 2018 | $4,330,141 |
| **TOTAL** | **$15,491,788** |

65.     Instead of putting all of the prevailing wage workers' retirement funds into the profit sharing and 401(k) account of the worker who actually earned it, GOH stole that money and used it to pay for all GOH employees', executives', and owners' retirement savings. As a result, the company's prevailing wage workers (including Plaintiff) have been left with, and continue to be left with, vastly short-changed profit sharing and 401(k) accounts. Further, as a result of this theft, the prevailing wage workers were vastly short-changed on the wages they were actually paid, as those cash wages were lowered due to the false representation of fringe benefit amounts that were not actually paid to Plaintiff and similarly situated employees.

66.     Both the PWA and the DBA also permit contractors to allocate prevailing wage fringe benefit funds to bona fide health and welfare benefits such as health insurance, life insurance, disability insurance and paid time off. Contribution amounts may only be used to pay for benefits for the prevailing wage worker who earned the money and must be reasonably anticipated to cover the cost of that worker's benefits.

67.     Since GOH was claiming the full fringe benefit credit for all prevailing wage workers per hour, it was obligated to provide that amount in fringe benefits to those workers. In reality, GOH was only paying a fraction of the required amount in the form of health and welfare benefits for prevailing wage workers and was stealing the rest to pay for the health and welfare benefits of all of the remaining non-prevailing wage employees and executives at the company. GOH disguised this theft by reporting to government agencies that it was paying well in excess of what was

required by law, using an hourly health and welfare figure that was based on grossly inflated costs and nonqualifying expenses.

68.     Prior to 2019, GOH accounting employees conducted a so-called "Benefits Analysis" annually to determine the hourly credit the company would take for providing health and welfare benefits to employees. But many of the costs GOH included in this calculation were either grossly inflated or were not allowable costs. GOH also failed to employ an appropriate annualization calculation.

69.     Based on these false numbers, GOH reported the hourly cost of its health and welfare benefits to be between $14 and $19, depending on the year. By claiming these inflated credits when submitting fringe benefit letters and certified payroll records to public agencies, GOH obscured the reality: the actual cost of providing health and welfare benefits to employees ranged from $4 to $7 per hour, and was heavily subsidized by funds stolen from prevailing wage workers, including Plaintiffs.

70.     GOH operates a self-funded health insurance plan. This means that GOH pays health insurance claims itself instead of paying insurance premiums to an insurance company that would then be responsible for paying claims. Between 2015 and 2018, GOH contracted with a third-party administrator, Cigna, to administer its health insurance plan. Beginning in 2018, GOH contracted with Aetna to serve as a third-party administrator.

71.     By contracting with a third-party administrator, like Cigna or Aetna, companies with self-funded health insurance plans receive the benefit of the third-

party administrator's network of participating providers. Participating providers agree to accept a set payment, which is usually much less than the provider's typical fee, as full payment. Therefore, the amount the company pays out in claims is substantially lower than the amount billed on claims. These agreements vastly lower self-funded insurance plans' costs.

72.     When calculating the hourly cost of providing health benefits, GOH used the total amount of claims considered, instead of what it actually paid out, in its Benefits Analysis calculation. By using the total claims considered amount instead of the claims actually paid amount, GOH took credit not only for millions of dollars in contractual write-offs that were never paid by anyone, but also for money paid by the prevailing wage workers and other employees in the form of deductibles, copays and employee payroll contributions. Between 2015 and 2018, GOH included over $50 million in costs it never paid into the health and welfare calculations:

| YEAR | CLAIMS SUBMITTED | CLAIMS PAID | DIFFERENCE |
|---|---|---|---|
| 2015 | $24,723,446 | $12,756,422 | $(11,967,024) |
| 2016 | $21,891,122 | $11,065,510 | $(10,825,612) |
| 2017 | $27,310,916 | $13,096,921 | $(14,213,995) |
| 2018 | $26,647,775 | $12,887,585 | $(13,760,190) |
| **TOTAL** | **$100,573,259** | **$48,806,438** | **-50,766,821** |

73.     GOH also included a number of ineligible expenses in the health and welfare hourly cost calculation. GOH wrongly included the cost of paying the company's own human resources employees in the health and welfare calculation. While the PWA and the DBA allow contractors with self-insured plans to include external administrative costs, like third-party plan administrator's fees, in their health and welfare cost calculation, they are not permitted to include internal

administrative costs, including employee wages. GOH included the cost of paying wages for GOH employees who purportedly had some involvement in benefits administration, plus ten percent to cover employer payroll taxes. Between 2015 and 2018, GOH added approximately $1.8 million in ineligible personnel wages to its health and welfare cost calculation:

| YEAR | GOH BENEFITS PERSONNEL WAGES |
|---|---|
| 2015 | $410,637.81 |
| 2016 | $411,778.51 |
| 2017 | $488,769.70 |
| 2018 | $457,490.57 |
| TOTAL | $1,798,676.59 |

74.    GOH also included a line item called "Additional Costs that support Plan" in its health and welfare cost calculation. Those additional costs had nothing to do with health and welfare. Instead, GOH added 401(k) match funds into its health and welfare cost calculation. Between 2015 and 2018, GOH lumped over $3.9million of 401(k) matching funds into its health and welfare calculation:

| YEAR | ADDITIONAL COSTS THAT SUPPORT PLAN |
|---|---|
| 2015 | $619,054.00 |
| 2016 | $1,015,476.41 |
| 2017 | $1,122,595.50 |
| 2018 | $1,154,053.70 |

75.    Moreover, GOH ignored employee health insurance payroll contributions when calculating the health and welfare cost credit. Depending on the health plan option the worker selected, many GOH workers were required to make contributions toward the health plan. But these contributions, totaling over $10 million, were simply ignored by GOH. Between 2015 and 2018, the following

employee contributions were deducted from workers' paychecks, but GOH did not apply them as an offset to the company's calculation for health care cost credits:

| YEAR | EMPLOYEE CONTRIBUTIONS |
|---|---|
| 2015 | $3,086,441 |
| 2016 | $2,919,411 |
| 2017 | $2,494,139 |
| 2018 | $2,357,867 |
| TOTAL | $10,857,858 |

76.    GOH also included the cost of providing all of its employees with paid time off in the health and welfare cost credit calculation. Although some of that money was allocated toward paid time off for prevailing wage workers, GOH failed to annualize that benefit as required by law. Instead of using that total amount for the calculation, GOH was required to use and annualized, per-worker cost based on the amount of paid leave prevailing wage workers actually used in the calculation.

77.    Using the actual amount of money GOH paid out in health insurance claims, removing ineligible expenses, and giving workers credit for their own payroll contributions, the actual hourly health and welfare cost GOH was required to report to public agencies was:

| YEAR | GOH H&W HOURLY RATE | ACTUAL H&W HOURLY RATE | DIFFERENCE |
|---|---|---|---|
| 2015 | $14.65 | $5.03 | -$9.62 |
| 2016 | $14.01 | $4.19 | -$9.85 |
| 2017 | $17.50 | $5.23 | -$12.27 |
| 2015 | $18.65 | $6.67 | -$11.98 |

78.    The OAG's forensic accountant applied the actual health and welfare hourly rate to the hours worked by prevailing wage workers during the Class Period (defined below). The accountant compared the amount of fringe benefit funds actually

27

spent on providing health and welfare benefits to prevailing wage workers to what GOH was required to pay based on the wage determination. Between 2015 and 2018, the total health and welfare underfunding was approximately $5.3 million:

| YEAR | H&W UNDERFUNDING |
|:---:|:---:|
| 2015 | $426,430 |
| 2016 | $2,063,459 |
| 2017 | $1,583,202 |
| 2018 | $1,233,866 |
| **TOTAL** | **$5,306,957** |

79.    This money should have been paid to the prevailing wage workers (including Plaintiffs) either as additional pension contributions or in cash.

80.    All current and former prevailing wage workers employed by GOH during the period 2015 through 2018 (including Plaintiffs) continue to suffer harm from Defendants' scheme to short and steal the workers' wages and benefits, as the profit sharing and 401(k) plans remain underfunded and the prevailing wage workers all failed to receive all wages earned and owed, as required by law. The prevailing wage workers (including Plaintiffs) have also been deprived of the retirement savings they otherwise should have received had timely payments to their profit sharing and 401(k) plans been made and timely wage payments been received.

81.    All prevailing wage workers of Hawbaker (including Plaintiffs) are the intended third-party beneficiaries of a tolling agreement entered into by the company and the OAG. Moreover, prior to the filing of felony charges against the company by the OAG, the prevailing wage workers (including Plaintiff) could not have discovered through reasonable diligence the scheme and deceit designed, implemented and maintained by Hawbaker.

## CLASS ACTION ALLEGATIONS

82.     ERISA, 29 U.S.C. §1132(a)(2), authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

83.     Acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

> All current and former hourly wage employees who worked on prevailing wage contracts at Hawbaker within the Commonwealth of Pennsylvania during the period September 1, 2012 through December 31, 2018" (the "Class").[3]

84.     The members of the Class are so numerous that joinder of all members is impractical. According to the 2019 Form 5500 filed with the U.S. Department of Labor, there were more than 1,400 Plan participants with account balances, as of December 31, 2019.

85.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan during the time period at issue in this lawsuit and they have suffered injuries as a result of Defendants' breaches of fiduciary duties alleged herein, including Defendants' failures to abide by

---

[3] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

the terms of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

86.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

    C.    Whether the Board Defendants failed to adequately monitor the Plan Administrator and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

87.    Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

88.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of

separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

89.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

90.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

91.     The Class is readily identifiable from the Defendant's records.

92.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

31

93.     Without a class action, Defendant will likely retain the benefit of its wrongdoing, which will result in further and continuing damages to Plaintiff and the Class. Plaintiff envisions no difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against Defendant Hawbaker and the Plan Administrator)

94.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

95.     At all relevant times, Defendants Hawbaker and the Plan Administrator (the "Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

96.     As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

97.     The scope of the fiduciary duties and responsibilities of the Prudence Defendants includes discharging its duties with respect to the Plan solely in the

32

interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA, including administering the Plan in accordance with its terms.

98.   At all times relevant to this action, the terms of the Plan mandated that both employee contributions and employer contributions be allocated promptly to the participant accounts for whom such contributions are made.

99.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Among other things, Defendants' failed to comply with the terms of the Plan and applicable DOL regulations by failing to make required contributions to Plaintiffs' and the Class' individual 401(k) accounts within the strict time limitations for making such contributions and in required the amounts, to the detriment of participants and beneficiaries, which constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

100.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

101.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

102.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Defendants Hawbaker and the Board)

103.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

104.   Hawbaker and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove and replace the Plan Administrator, and were aware that the Plan Administrator had critical responsibilities as a fiduciary of the Plan.

105.   In light of this authority, the Monitoring Defendants had a duty to monitor the Plan Administrator to ensure that the Plan Administrator adequately

performed its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Plan Administrator did not fulfill those duties.

106.   The Monitoring Defendants also had a duty to ensure that the Plan Administrator possessed the needed qualifications and experience to carry out its duties (or used qualified advisors and service providers to fulfill its duties); had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and administration of contributions to the Plan; and reported regularly to Hawbaker and the Board Defendants.

107.   Hawbaker and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Plan Administrator or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Plan Administrator's imprudent and disloyal actions and omissions;

(b)   failing to monitor the processes by which Plan contributions were made to participant accounts; and

(c)   failing to remove and replace the Plan Administrator whose performance was inadequate in that it failed to abide by the terms of the Plan in making contributions to participant accounts, to the detriment of the Plan and Plan participants' retirement savings.

108.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Hawbaker and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

109.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Hawbaker and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Plan Administrator. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Hawbaker to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Hawbaker as necessary to effectuate said relief, and to prevent the

36

Hawbaker's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Dated: September 29, 2021

Michael D. Donovan (PA ID # 51895)
DONOVAN LITIGATION GROUP, LLC
1885 Swedesford Road
Malvern, PA 19355
(610) 647-6067
mdonovan@donovanlitigationgroup.com

Eric Lechtzin (PA ID # 62096)
Marc H. Edelson (PA ID # 51834)
EDELSON LECHTZIN LLP

3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com
medelson@edelson-law.com

*Counsel for Plaintiffs and the Proposed Class*